1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
2
     Case No. 18-cv-03016-MSK-NYW
3    _____

4    VIDEOTAPE DEPOSITION OF:  BRIAN VICENTE, ESQ.
                               November 21, 2019
5    _____

6    DAVID JOSHUA BARTCH,

7    Plaintiff,

8    v.

9    MACKIE A. BARCH, and
     TRELLIS HOLDINGS MARYLAND, INC.,
10
     Defendants.
11   _____

12          PURSUANT TO NOTICE, the deposition of BRIAN
     VICENTE, ESQ., was taken on behalf of the Plaintiff at
13   1900 Grant Street, Suite 1025, Denver, Colorado 80203,
     on November 21, 2019, at 9:56 a.m., before Kirsten M.
14   Thorngate, Registered Professional Reporter and Notary
     Public within Colorado.

15

16

17

18

19

20   **H+G**

21

22   Hunter + Geist, Inc.

23   **303.832.5966**      1900 Grant Street, Suite 1025      ▪ www.huntergeist.com
     **800.525.8490**      Denver, CO 80203                   ▪ scheduling@huntergeist.com

24                        Your Partner in Making the Record

25

Brian Vicente, Esq.  11/21/2019
DAVID JOSHUA BARTCH v. MACKIE A. BARCH, ET AL.

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2
   Case No. 18-cv-03016-MSK-NYW
3    _____
4  VIDEOTAPE DEPOSITION OF:  BRIAN VICENTE, ESQ.
                      November 21, 2019
5
6  DAVID JOSHUA BARTCH,
7  Plaintiff,
8  v.
9  MACKIE A. BARCH, and
   TRELLIS HOLDINGS MARYLAND, INC.,
10
   Defendants.
11  _____
12          PURSUANT TO NOTICE, the deposition of BRIAN
   VICENTE, ESQ., was taken on behalf of the Plaintiff at
13 1900 Grant Street, Suite 1025, Denver, Colorado 80203,
   on November 21, 2019, at 9:56 a.m., before Kirsten M.
14 Thorngate, Registered Professional Reporter and Notary
   Public within Colorado.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
1            A P P E A R A N C E S
2  For the Plaintiff:
3          PAUL H. SCHWARTZ, ESQ.
           Shoemaker Ghiselli Schwartz L.L.C.
4          1811 Pearl Street
           Boulder, Colorado 80302
5          pschwartz@sgslitigation.com
6
   For the Defendants:
7
           ARI CASPER, ESQ.
8          The Casper Firm, L.L.C.
           400 East Pratt Street
9          Suite 903
           Baltimore, Maryland 21202
10         acasper@casperfirm.com
11
   For the Deponent:
12
           KEVIN P. PEREZ, ESQ.
13         Nemirow Perez, P.C.
           445 Union Boulevard
14         Suite 209
           Lakewood, Colorado 80228
15         kperez@nemirowperez.com
16
   Also Present:
17
           John Jensen, Videographer
18
19
20
21
22
23
24
25
```

**Page 3**

```
1              I N D E X
2  EXAMINATION OF BRIAN VICENTE, ESQ.:       PAGE
   November 21, 2019
3
   By Mr. Schwartz                          6, 225
4
   By Mr. Casper                              227
5
6  DEPOSITION EXHIBITS:                     INITIAL
7                                          REFERENCE
   Exhibit 68 Letter to Bartch from Vicente,    22
8             3/23/15
9  Exhibit 69 Email to Bartch from Vicente,     87
              8/24/15, Subject:  Re:  Draft
10            letter, with emails attached
11 Exhibit 70 Email to Bartch from Weinberg,   107
              8/24/15, Subject:  Fwd:  Issue for
12            Tyler, with email attached
13 Exhibit 71 Email to evolutionaryventures.com 124
              from Yueng, 9/23/15, Subject:
14            [Update] Doctors Orders and VS MD/HI
              weekly call
15
16 Exhibit 72 Email to Bartch from Yeung, 9/22/15, 150
              Subject:  Timely Issues for D.O.'s
17            Maryland Application
18 Exhibit 73 Email to Barch from Vicente, 10/1/15, 161
              Subject:  [Update] Doctors Orders
19            MD - ownership structure
20 Exhibit 74 Email to Alvoisetti from Flank,    167
              10/27/15, Subject:  RE:  DO Maryland
21            OP LLC Operating Agreement, with
              emails attached
22 Exhibit 75 Invoice, Vicente Sederberg, 11/17/15 186
23 Exhibit 76 Email to Bartch from Barch, 9/7/19, 191
              Subject:  FW:  FB Post, with emails
24            attached
25
```

**Page 4**

```
1  Exhibit 77 Email to Weinberg, et al., from   214
              Vicente, 3/31/16, Subject:  WashPo and
2             DO Maryland
3  Exhibit 78 Email to Vicente from Giudice, 7/9/16, 219
              Subject:  Re:  Urgent Communication
4             from Maryland Medical Cannabis
              Comminication, with emails attached
5
   Exhibit 79 Invoice, Vicente Sederberg, 8/17/16  209
6
7  DEPOSITION EXHIBITS:  (Previously Marked)
8  Exhibit 2                                      242
   Exhibit 3                                      234
9  Exhibit 5                                      169
   Exhibit 6                                      232
10 Exhibit 8                                      110
   Exhibit 9                                      162
11 Exhibit 17                                     200
   Exhibit 19                                     229
12 Exhibit 20                                      67
   Exhibit 22                                     202
13 Exhibit 23                                     202
   Exhibit 31                                     223
14 Exhibit 42                                     193
   Exhibit 43                                     200
15 Exhibit 45                                     134
   Exhibit 53                                     146
16 Exhibit 54                                     168
   Exhibit 60                                     178
17 Exhibit 63                                     127
18
19
20
21
22
23
24
25
```

Brian Vicente, Esq.  11/21/2019
DAVID JOSHUA BARTCH v. MACKIE A. BARCH, ET AL.
Pages 5..8

Page 5

1        WHEREUPON, the following proceedings were
2   taken pursuant to the Federal Rules of Civil
3   Procedure.
4        *     *     *     *     *
5        THE VIDEOGRAPHER:  Good morning.  We are
6   on the record.  The time is 9:56 a.m. on November 21,
7   2019.  We are here for the videotaped deposition of
8   Brian Vicente in the matter of David Joshua Bartch
9   versus Mackie A. Barch, et al., for the United States
10  District Court, Civil Action Number
11  18-cv-03016-MSK-NYW.
12        The deposition is being held at 1900
13  Grant Street, Suite 1025, Denver, Colorado.  The
14  videographer is John Jensen, and the court reporter is
15  Kirsten Thorngate with Hunter + Geist, Inc., a U.S.
16  Legal Company of Denver, Colorado.
17        Please note that audio and video
18  recording will take place until all parties have
19  agreed to go off the record.  Microphones are
20  sensitive and may pick up whispers, private
21  conversations, and cellular interference.
22        Will counsel please state their
23  appearances beginning with Counselor Schwartz.
24        MR. SCHWARTZ:  Paul Schwartz for the
25  plaintiff.

Page 6

1        MR. CASPER:  Ari Casper.  I represent the
2   defendants.
3        MR. PEREZ:  And Kevin Perez on behalf of
4   the deponent.
5            BRIAN VICENTE, ESQ.,
6   having been first duly sworn to state the whole truth,
7   testified as follows:
8        (Deponent's reply to oath:  "I do.")
9            EXAMINATION
10  BY MR. SCHWARTZ:
11     Q.  Good morning, Mr. Vicente.
12     A.  Good morning.
13     Q.  Let's just start with some definitions of
14  terms that we're going to use in the deposition.
15  First, because of the similarity in the sound of the
16  last names of Josh Bartch and Mackie Barch, I'll
17  probably be referring to the parties as "Josh" and
18  "Mackie" rather than by their last names.  There's
19  obviously no disrespect intended, and that's how we've
20  been doing it in other depositions.
21        If I use the terms "Doctors Orders
22  Maryland," "DOMD," or "Culta," those are all intended
23  to be the same company, i.e., Culta LLC, which is
24  formerly known as Doctors Orders Maryland LLC.  Do you
25  understand that?

Page 7

1     A.  Yes.
2     Q.  If I refer to DOMD Op, that refers to the
3   company DO Maryland OP LLC.  Understood?
4     A.  I don't know what that company is, but I
5   know that you're saying those words.
6     Q.  Fair enough.  And we'll see if we can
7   refresh your recollection --
8     A.  Thank you.
9     Q.  -- as it becomes appropriate in the
10  deposition.
11        If I refer to the "commission," unless I
12  say otherwise, that refers to the Maryland Medical
13  Cannabis Commission.  Understood?
14     A.  Yes.
15     Q.  Okay.  What did you do to prepare for
16  this deposition?
17     A.  I spoke with my attorney, Kevin Perez; I
18  reviewed various documents that I think are part of
19  these files.
20     Q.  Anything else?
21     A.  No.
22     Q.  Have you ever spoken to Mr. Casper before
23  meeting him here in the room this morning?
24     A.  I have spoken to Mr. Casper, yes.
25     Q.  When was that?

Page 8

1     A.  Several months ago, I believe.
2     Q.  How many times?
3     A.  I believe once or twice.
4     Q.  Was it by phone?
5     A.  It was by phone.
6     Q.  For how long in total?
7     A.  For how long until?
8     Q.  For how long in total?
9     A.  In total.  A half an hour, maybe.  45
10  minutes.
11     Q.  What did you discuss with Mr. Casper?
12     A.  To the best of my recollection, just
13  generally what was going on with this case.
14     Q.  Okay.  Did you ask him what was going on
15  with the case?
16     A.  Probably.
17     Q.  Who initiated the phone call?
18     A.  I believe it was either Mr. Casper or
19  Mackie.
20     Q.  And tell me everything you can remember
21  about the substance of what you discussed with
22  Mr. Casper?
23     A.  I don't have a whole lot of recollection
24  other than I spoke to Mr. Casper.  I believe Mackie
25  may have been on the phone and was just trying to get



Page 221

1 you can't make certain changes after an application.
2 But there are some potential exceptions to that, and
3 you just need to notify the State if you are making
4 certain changes. They'll tell you if you can or
5 can't.
6      Q. So did you ever say to Josh, in the
7 presence of others or not, words to the effect of, We
8 should not make changes to Doctors Orders Maryland
9 because it would require us to report that to the
10 commission?
11     A. I don't think I would have --
12     MR. PEREZ: I need to instruct you not to
13 answer to advice you may have given to Doctors Orders
14 Maryland. If you gave Josh advice individually,
15 that's fair game.
16     A. I have no recollection of giving Josh
17 individual advice about how to alter the application
18 or not, post submission.
19     Q. (BY MR. SCHWARTZ) Okay. And are you
20 refusing to answer that question with respect to
21 communications that you may have had with Josh
22 that were not specific to Vicente Sederberg's
23 representation of Josh in his individual capacity?
24     MR. PEREZ: Let the record reflect I'm
25 instructing him not to answer.

Page 222

1     A. I don't understand your question.
2     Q. (BY MR. SCHWARTZ) Based on -- strike
3 that.
4      Following Mr. Perez's instruction, you
5 testified that you did not have any such conversations
6 with Josh in his capacity as an individual client, and
7 I'm asking are you now refusing to answer my question
8 to the extent it relates to conversations you may have
9 had with Josh but just not in his capacity as an
10 individual -- a client in his individual capacity?
11 Are you refusing to answer that question.
12     MR. PEREZ: Counselor, is your question
13 did conversations like that occur? Because the prior
14 question was more of a what was said. This sounds
15 like it's just a purely did you have communications.
16     MR. SCHWARTZ: All right. Well, let's --
17     MR. PEREZ: Because that would be okay.
18     Q. (BY MR. SCHWARTZ) Let's break it down.
19 Did you have communications with Josh, in any context,
20 about the subject of whether Doctors Orders Maryland
21 should not make changes to the company because those
22 changes would have to be disclosed to the commission?
23     A. I do not recall speaking to Josh. That's
24 just a fact that changes generally need to be told to
25 the commission. But I don't recall, subsequent to

Page 223

1 November 2015, having that specific conversation with
2 Josh.
3      Q. Okay. Are you aware at some point DO
4 Maryland OP assigned some of its membership units in
5 Doctors Orders Maryland to Trellis Holdings Maryland?
6      A. Not really. It may have happened. I
7 don't follow these cap tables generally. Certainly
8 post application is not my -- I don't do a lot of
9 work.
10     Q. Were you involved in any decision on
11 behalf of Vicente Sederberg or VS Holdings whether to
12 approve Trellis Holdings Maryland as a new owner of
13 Doctors Orders Maryland?
14     A. That may have happened post submission,
15 pre final license. And I only remember that because I
16 think Nicola might have mentioned that to me at some
17 point, but I don't know for sure.
18     Q. Okay. Take a look at Exhibit 31, if you
19 would. Just tell me when you've read it.
20     A. I have the document in front of me.
21     Q. So Exhibit 31 is an April 22, 2017, email
22 from Mackie to Josh with the subject "Fwd: Trellis
23 Holdings Formation PDF Attached." Do you see that?
24     A. Yes.
25     Q. And as you can see, Mackie sends Josh an

Page 224

1 unsigned version of the articles of incorporation of
2 Trellis Holdings Maryland Inc. with the message: Just
3 an FYI, moving our shares into this entity. Do you
4 see that?
5      MR. CASPER: I'm just going to object.
6 The witness isn't on the document anywhere. He wasn't
7 copied on it.
8      Q. (BY MR. SCHWARTZ) My only question was,
9 sitting here today, do you see that, sir?
10     A. I see the document you're referring to,
11 yes.
12     Q. Thank you. Have you seen this document,
13 Exhibit 31, before?
14     A. I don't think so. It's possible in the
15 past several months I've spent preparing for this I've
16 seen it, but it doesn't look familiar.
17     Q. Did you ever discuss this document with
18 Josh, with or without others?
19     A. I really don't think so.
20     Q. Did you ever discuss with Josh or anyone
21 else the fact that Mackie was moving Josh's and
22 Mackie's shares into Trellis Holdings Maryland?
23     MR. CASPER: Objection. Lack of
24 foundation.
25     A. I've never had that conversation, or at

Page 225

1  least I really, really, really don't think I had that
2  conversation.  It doesn't sound familiar at all.
3      Q.  (BY MR. SCHWARTZ)  And does it surprise
4  you that in an email to Josh, Mackie wrote that he was
5  moving "our shares" into Trellis Holdings Maryland?
6      MR. CASPER:  Object to relevance.
7      A.  Well, I'm seeing this document for the
8  first time.  I haven't read it, so I don't know
9  exactly -- you're making an assumption that I
10  understand that he's moving -- that this involves
11  Maryland in some way, but maybe there's another
12  company.  I don't understand what's going on.
13      Q.  (BY MR. SCHWARTZ)  Well, I'll represent
14  to you that Mackie testified that by "shares," he was
15  referring to the units of -- the membership units of
16  Doctors Orders Maryland that are now held by Trellis
17  Holdings Maryland.
18      MR. CASPER:  Objection.
19      Q.  (BY MR. SCHWARTZ)  Does that --
20      MR. CASPER:  Go ahead.  Finish your
21  question.
22      Q.  (BY MR. SCHWARTZ)  Does that help you in
23  terms of context for answering these questions?
24      MR. CASPER:  Objection.  I'll represent
25  to you Mackie didn't say that.  So . . .

Page 226

1      MR. SCHWARTZ:  Really?
2      MR. CASPER:  Yeah, really.
3      MR. SCHWARTZ:  Okay.
4      MR. CASPER:  You asked him four times.
5  He said "No" to all of them, but go ahead.
6      MR. SCHWARTZ:  All right.  Well --
7      MR. CASPER:  The record will speak for
8  itself, but you can't mislead the witness.  If you
9  want to show him what he said, show him.
10      MR. SCHWARTZ:  Okay.
11      Go ahead.
12      MR. PEREZ:  What's the question now?
13  I've lost it.
14      Q.  (BY MR. SCHWARTZ)  The question is before
15  receiving Exhibit 31, Mr. Vicente, were you aware that
16  Mackie viewed the Trellis Holdings Maryland units in
17  Doctors Orders Maryland as being shares of Mackie and
18  Josh?
19      MR. CASPER:  Objection.  Lack of
20  foundation.  Mischaracterizes.  But go ahead.
21      A.  I was not aware of this agreement, no.
22      MR. SCHWARTZ:  No further questions.
23      MR. CASPER:  Do you want to take a break,
24  or do you want to start?
25      MR. SCHWARTZ:  I think we keep going.

Page 227

1          EXAMINATION
2  BY MR. CASPER:
3      Q.  When we went over your background and
4  qualifications, you testified that you provide advice
5  on cannabis regulatory matters, and that's across the
6  country, isn't it?
7      A.  Yes.
8      Q.  Is it fair to say, and albeit you may be
9  too humble to answer this, but you really -- you and
10  your firm, you're really a pioneer in the field of
11  cannabis and medical cannabis and regulatory matters;
12  is that fair?
13      A.  I think that's fair to say.
14      Q.  And today, you give advice to medical
15  cannabis companies all across the country; do you not?
16      A.  Correct.
17      Q.  And that entails, I think you said
18  earlier, giving advice on the application process,
19  building out the application process.  It's one of the
20  things you do?
21      A.  Yes.
22      Q.  In addition to that, one of the things
23  you do is to study and learn the cannabis regulations
24  in the state for which you're giving advice to your
25  client?

Page 228

1      A.  Correct.
2      MR. CASPER:  I'm going to offer
3  Mr. Vicente as an expert in medical cannabis
4  regulation.
5      MR. SCHWARTZ:  That's not a thing, but go
6  ahead.
7      Q.  (BY MR. CASPER)  And you were familiar
8  with the Maryland regulations at the time when Doctors
9  Orders Maryland was proceeding with its application,
10  were you?
11      A.  Yes.
12      Q.  Is it fair to say that you and your team
13  were providing the cannabis regulatory advice and
14  Mr. Flank and his firm was really doing the corporate
15  structure and governance of the Doctors Orders entity?
16      MR. PEREZ:  Object to form, foundation.
17      A.  I would say that's generally accurate.
18  It could be that there were others.  They had
19  lobbyists and others that probably were providing
20  insight about regulatory matters as well.  Yes, I was
21  not involved on the corporate side.  That's not really
22  what we do here.
23      Q.  (BY MR. CASPER)  I want to talk to you
24  about the advice that you gave Josh in connection with
25  these entities.  If you turn to Exhibit 20, which you

Page 229

1  looked at earlier, and Mr. Schwartz spent a lot of
2  time with you on this.  I'm just going to ask you a
3  couple of questions.
4        When you gave the advice in July of 2015
5  that the goal of the team was -- and this is the
6  Maryland team -- that the State is transparency and
7  100 percent compliance with the law, is that the
8  advice that you continued to give Doctors Orders
9  Maryland and its members and folks related to that all
10 the way through?
11     A.  Yes.
12     Q.  And when you said "In short, we need to
13 avoid creating side deals that would almost definitely
14 need to be divulged to the State in the application
15 process," did you ever change that advice to either
16 Josh or anyone else?
17     A.  No.  I was consistent in that.
18     Q.  All right.  If you look at Exhibit 19,
19 this is an email from Josh Bartch to Herb Wilkins and
20 Mackie.  And Josh writes "Herb, there is zero question
21 as to my ownership and how that transpired throughout
22 the process," and he's talking about Doctors Orders
23 Maryland.  And he then goes on to say that "Vicente
24 Sederberg created the plan to conceal my ownership
25 throughout the process to give us the best chance to

Page 230

1  win."  Do you see that?
2      A.  I do.
3      Q.  Is that true?
4      A.  That's false.
5      Q.  Would it have been illegal to conceal
6  Josh's ownership if you were, in fact, an owner of
7  Doctors Orders Maryland and not tell the Maryland
8  cannabis commission?
9      A.  Yes.
10     Q.  Would it be unethical?
11     A.  Yes.
12     Q.  Would it be improper?
13     A.  Yes.
14     Q.  Would it be wrong?
15     A.  Yes.
16     Q.  Would it be misleading to the commission?
17     A.  Yes.
18     Q.  Is that something that you would have
19 participated in?
20     A.  No.
21     Q.  Did Josh ever ask you if that's something
22 that you would be willing to do on his behalf?
23     A.  In terms of constructing a plan to
24 conceal his ownership?
25     Q.  Yes.

Page 231

1      A.  Definitely not.
2      Q.  And Josh was deposed in this case, just
3  so there's no misunderstanding.  I'm going to read to
4  you what he said.  On page 42, line 7, he says "They
5  advised me that I should have somebody temporarily
6  hold legal ownership for my benefit, yes."
7        And I said "Okay.  Was it Vicente
8  Sederberg's idea to do that?"
9        Answer from Josh:  "It was a number of
10 individuals, not limited to Vicente Sederberg, but
11 they were very instrumental in it, yes."
12       Is that a true statement?
13     A.  That's a false statement.
14     Q.  Have you ever advised the client to
15 conceal ownership from a cannabis commission?
16     A.  Absolutely not.
17     Q.  And that would be breaking the law,
18 wouldn't it?
19     A.  That would be breaking the law.  And,
20 also, you know, in our experience, and we've done
21 hundreds of applications like this, States take very
22 seriously and put a great amount of scrutiny into
23 ownership.  And they want to drill down and figure out
24 who the owners are.  So our advice is always 100
25 percent disclosure on who the accurate owners are.

Page 232

1      Q.  And in Maryland, was that also the case
2  where the Maryland cannabis commission, their interest
3  was in providing and promulgating the regulations,
4  that they wanted to know who the actual owners were of
5  these entities?
6      A.  Absolutely.
7      Q.  Did you make that clear to Josh?
8      A.  Yes, and everyone on the team.
9      Q.  If you look in Exhibit 6 in your binder,
10 these were Josh's answers to interrogatories in this
11 case which he swore under oath were true and correct.
12 And if you look at the middle of the page, on page 11,
13 he says "On October 1, 2015" -- do you see where I am?
14 About seven, eight lines down?
15     A.  Yes, I do.
16     Q.  -- "Josh, Mackie, and attorneys at
17 Vicente Sederberg participated in a call to discuss
18 the ownership structure of DOMD."  Do you see that?
19     A.  Yes.
20     Q.  And DOMD, as he defined it, is Doctors
21 Orders Maryland.
22     A.  Okay.
23     Q.  During this call, and subsequent
24 discussions, it was agreed that Jeff Black and Ashley
25 Peebles initially would hold 100 percent of Josh's

Page 233

1  interest in DOMD, open paren, which Josh held through
2  DO Maryland OP, LLC, DOMD OP, for Josh's benefit.
3       Do you see that?
4       A.  I do.
5       Q.  Is that true?
6       A.  No.  To the extent that -- I don't recall
7  this discussion, and there's just -- so my
8  understanding is, ultimately, those individuals did
9  have the ownership, but there seems to be a number of
10  misstatements within here about things happening
11  initially and holding and other things that appear to
12  indicate something that would be an illegal side deal,
13  and that was not ever discussed, at least by my team.
14       Q.  All right.  And Josh also represented
15  that your firm was compensated for reaching -- or
16  structuring the deal through which he claims Mr. Flank
17  and Mr. Peebles were going to hold his interest in
18  some kind of side deal.  Was that true?
19       A.  No.  And this just is a strange
20  mischaracterization.  This 4.5 percent was in the
21  engagement agreement.  The engagement agreement lays
22  out why we were given that.  So this is sort of a
23  shocking departure.
24       Q.  And on page 157, line 3, of Josh's
25  deposition I asked him:  "Well, is this consistent

Page 234

1  with what you recall, that Vicente Sederberg got 4 1/2
2  percent interest from two things" -- and I'm taking
3  this from his interrogatories -- "one, the services it
4  provided and advice to you for structuring this deal
5  where your interests would be held in agreement
6  whereby Black and Peebles would hold your interest?"
7       And he said "That's consistent."
8       Is it true that one of the reasons
9  Vicente Sederberg was given a 4 1/2 percent interest in
10  Doctors Orders Maryland was for structuring the deal
11  that Josh claims he had where Mr. Black and Peebles
12  would hold his interest for him?
13       A.  That is a false statement.
14       Q.  Did you tell Josh that anyone could hold
15  an interest for him as a beneficial owner of Doctors
16  Orders Maryland during any period of time?
17       A.  No.  Because that would have been
18  illegal.  And I clearly told him and the team that
19  we're not structuring side deals for illegal
20  ownership.
21       Q.  There's been a lot of discussion about
22  what the Colorado court held in the criminal case.  If
23  you turn to Exhibit 3.  And if you look at page 16 on
24  Exhibit 3.
25       On page 16, line 9, it says "The Court

Page 235

1  will determine that Mr. Bartch's participation in or
2  ownership in a medical marijuana business, although it
3  may be legal under state law, is nevertheless
4  currently a violation of federal law.  And ongoing
5  participation and/or ownership in that business would
6  represent a violation of the terms and conditions of
7  the deferred judgment.  That's the Court's ruling."
8       Do you see that?
9       A.  Yes, sir.
10       Q.  Was that your understanding of the
11  Colorado court's ruling in Josh's criminal case?
12       A.  Yes.
13       Q.  And you testified earlier that one of the
14  reasons that Josh could not be an owner of Doctors
15  Orders Maryland was because the terms of his probation
16  prohibited him from owning a marijuana business.  Do
17  you recall that?
18       A.  Yes.
19       Q.  Did you give Josh the advice that he
20  could somehow have someone hold his interest in
21  Doctors Orders Maryland to avoid -- or to be in
22  compliance with the Colorado sentencing court?
23       A.  No.
24       Q.  Would that be legal to, given the Court's
25  order and would you have advised him, that he could

Page 236

1  have somebody hold his interest in Doctors Orders
2  Maryland during that time?
3       A.  That was a multipart question, but that
4  would have been -- I did not say that to him, and it
5  would have been illegal to structure that.
6       Q.  And it would have been unethical?
7       A.  It would have been unethical.
8       Q.  Improper?
9       A.  Improper.
10       Q.  Wrong?
11       A.  Correct.
12       Q.  It would have been misleading the
13  Colorado court?
14       A.  Correct.
15       Q.  If you look at Exhibit -- well, one of
16  the other things you said about as to why Josh would
17  not -- could not be an owner in Maryland was that he
18  would be disqualified as an owner under the Maryland
19  regs given his criminal problems.  Do you recall that?
20       A.  Yes.
21       Q.  And was that a consideration in deciding
22  and recommending that Josh could not be an owner in
23  Maryland?
24       A.  That was one of the factors, yes.
25       Q.  And the third factor was, I think you

Page 237

1 said, the optics. Somebody who has a drug conviction
2 would hurt the application tremendously and would be a
3 major red flag for an entity that's trying to obtain a
4 license to be in the medical marijuana arena?
5    A. Correct.
6    Q. And did you tell Josh that if he was on
7 the license that the Doctors Orders Maryland entity
8 would have a very difficult time obtaining the
9 license?
10   A. I believe I would have said that, yes,
11 because that would be true.
12   Q. And that's your opinion?
13   A. That is my opinion.
14   Q. If you look Exhibit 9, which you looked
15 at earlier.
16   A. Okay.
17   Q. And this is the Doctors Orders Maryland
18 amended and restated operating agreement dated
19 November 5, 2015. And if you look at the back -- and
20 Mr. Schwartz showed you this earlier. Exhibit A is
21 the cap table.
22   A. Yes.
23   Q. Do you recall looking at that?
24       And for DO Maryland OP, that's Jeff
25 Black's entity, to your recollection?

Page 238

1    A. Correct.
2    Q. And then you had the other members: TJ
3 Health LLC, Morris Medical LLC, and Vicente Sederberg
4 LLC. Do you see that?
5    A. Yes.
6    Q. Okay. Did Exhibit A, on November 5,
7 2015, accurately represent the owners of Doctors
8 Orders Maryland LLC?
9    A. To my understanding, yes.
10   Q. And given that you signed off on this,
11 did anyone say to you in connection with this
12 agreement, Well, Josh actually has some kind of
13 interest in Doctors Orders Maryland LLC?
14   A. No.
15   Q. And if he did have an interest, would
16 that have had to have been disclosed to the Maryland
17 cannabis commission?
18   A. If he had an equity interest, that would
19 have to be disclosed, correct.
20   Q. And as someone who was spearheading the
21 application, it was not disclosed. And is that
22 because, in your view, Josh did not have any interest,
23 beneficial, legal, or any other interest in Doctors
24 Orders Maryland that represented any type of ownership
25 interest?

Page 239

1    A. Correct.
2    Q. Josh testified in his deposition on page
3 98, line 16, was -- the original agreement was that
4 he -- and he's talking about Scott Gelbard -- "would
5 own half my interest in Maryland, and that agreement
6 never changed."
7        Do you know who Scott Gelbard is?
8    A. No.
9    Q. Have you ever heard his name?
10   A. I've heard the name, I guess, in
11 preparing for this and that he was in Josh's partner
12 that was in trouble in Canada or something like that.
13   Q. Okay. Well, I don't want to know
14 anything you talked to your attorney about.
15   A. Okay. So then I believe I've heard the
16 name.
17   Q. Did Josh ever tell you that his partner
18 in Doctors Orders Maryland, at least at the time when
19 he had an ownership interest, was Scott Gelbard?
20   A. Not to my recollection.
21   Q. And what, if any, effect would that have
22 had on an application if Josh had submitted an
23 application to the Maryland cannabis commission with a
24 partner who was under indictment for securities fraud?
25       MR. SCHWARTZ: Object to form.

Page 240

1    A. If that would have occurred, that would
2 have been a major red flag and potentially could have
3 caused the application to either be rejected,
4 possibly, disqualified, or just hurt it from a points
5 perspective. And the more points you get, the better
6 you do.
7    Q. (BY MR. CASPER) And during the entire
8 time you represented Josh, did he ever tell you that
9 Scott Gelbard had half of his interest in the
10 marijuana entity?
11   A. I have no recollection of that.
12   Q. When Mr. Schwartz asked you about whether
13 Josh received any compensation for his early work in
14 Doctors Orders Maryland, to your understanding did
15 Josh have a choice in whether to relinquish his
16 ownership in Doctors Orders Maryland given the
17 Colorado Court's order?
18   A. No. I mean, it had to happen or else he
19 would be violating this order.
20   Q. Are you familiar at all with Doctors
21 Orders Maryland's efforts to classify any money that
22 Josh had put into Doctors Orders Maryland as loans to
23 be repaid to Josh?
24   A. No.
25   Q. Are you generally familiar with the