IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 18-cv-03016-RBJ-NYW

DAVID BARTCH,

    Plaintiff,

v.

MACKIE A. BARCH and
TRELLIS HOLDINGS MARYLAND, INC.,

    Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER OF JUDGMENT

This case was tried to the Court from July 11 to July 14, 2022. Plaintiff David Joshua Bartch, who goes by "Josh," sued defendants Mackie Barch and Trellis Holdings Maryland for allegedly refusing to return plaintiff's interest in a medical marijuana company, Doctor's Orders Maryland (DOMD)[1]. Due to the similarity in the plaintiff's and defendant Barch's names, I will refer to them as "plaintiff" and "Mackie" or "defendant" in this order.

### I.    BACKGROUND

This section summarizes the parties' dispute and lays out uncontroversial facts. I resolve the disputed factual questions in later sections. In describing the background and making my findings of fact, the Court has considered the reporter's unofficial transcript, the exhibits admitted into evidence, and the Court's own notes, recollections, and impressions of the evidence.

---

[1] Doctor's Orders Maryland is currently doing business as Culta, LLC. When I refer to DOMD, I mean the company currently called Culta.

1

Plaintiff took over a small marijuana business in Colorado, Doctor's Orders Denver, and grew it into a successful company. He connected with Mackie, who had a more traditional business background, and the two of them collaborated on plaintiff's Denver business. They also contemplated a new venture in Maryland, which had recently legalized medical marijuana. Plaintiff signed a deal with the preeminent marijuana law firm, Vicente Sederberg LLP, to represent him in Maryland. With the help of Vicente Sederberg and defendant, plaintiff founded Doctor's Orders Maryland (DOMD) on June 6, 2015. He owned 70% of the company as Class A dilutable shares through a subsidiary, DO Maryland OP LLC (DOMD OP). A prominent philanthropic family, the Weinbergs, owned the other 30% as Class B non-dilutable shares.

DOMD's sole focus was getting a license from the Maryland Medical Cannabis Commission. The commission was soliciting applications for a small number of growing licenses, processing licenses, and distribution licenses. Plaintiff's cannabis experience and the Doctor's Orders brand were an important part of DOMD's optimism about receiving a license. Over the next few months, plaintiff, defendant, the Weinbergs, and Vicente Sederberg worked together to position DOMD for the competitive application process. Plaintiff contributed at least $251,000 to the business. Defendant worked hard, and all expected that he would be rewarded with a substantial equity interest. Vicente Sederberg received a 4.5% ownership interest in DOMD in October 2015, reducing plaintiff's ownership to 65.5%.

Although plaintiff's inclusion in DOMD was important for the company's prospects, it was legally suspect. Plaintiff had, in 2014, entered into a deferred judgment in Denver District Court for misdemeanor drug possession. In June 2015 that court clarified that plaintiff would violate the conditions of his deferred judgment if he owned a marijuana business, but the court would allow him reasonable time to divest if he chose to do so. Less than a month later, plaintiff

formed DOMD.[2]  The parties apparently thought this was okay because DOMD was *technically* not a marijuana business, just a corporate entity exploring the possibility of applying for licenses to become a marijuana company.

DOMD submitted its applications on November 6, 2015.  In preparation, the DOMD team connived and obfuscated whenever they felt it would help their application chances.[3]  In one September email, Brian Vicente of the Vicente Sederberg law firm encouraged the team to find people they could put down as "CFO, CEO, Security Head, etc." for application purposes, but assured the team that "[o]f course, that does not mean we [DOMD] have to hire them once the license is awarded."  Ex. 53.  A number of email threads show that DOMD planned to conceal the company's true ownership for one reason or another.  Vicente Sederberg advised them that "Maryland residents look better on paper than non-residents."  Ex. 23.  Defendant, who at this point had worked hard enough to merit an ownership interest, was kept off the application because of possible tax and/or legal issues.  And, plaintiff, whose deferred drug-possession conviction would have torpedoed the application, was nowhere to be found on the final document DOMD submitted.

A new operating agreement, enacted the day before DOMD's application, shows a new ownership structure.  The Weinbergs held 30%, Vicente Sederberg had 4.5%, a new investor named Herb Wilkins had, in exchange for $1 million, acquired a 5% interest, and DOMD OP held 60.5%.  But in this new agreement, DOMD OP was no longer owned by plaintiff but by Jeff

---

[2] Over the next two years, plaintiff and defendant also formed similar companies in Oregon and Hawaii — which they split 50/50 — for similar purposes.

[3] DOMD and their lawyers sought to cover their tracks with emails saying things like "we need to avoid creating 'side deals,'" or "the goal . . . is 100% transparency with the commission."  Ex. 20.  These legalistic fig leaves were meant to conceal the dishonesty with which DOMD approached the application process.  The Court, which had the opportunity to peer behind the curtain, was not fooled.  The Maryland Medical Cannabis Commission, which was not shown how the sausage was made, apparently was.

Black and Ashley Peebles. Plaintiff had transferred his entire interest to Black and Peebles. The parties dispute whether Black and Peebles had agreed to return the interest to plaintiff (less a small fee) or whether plaintiff's transfer was a permanent divestiture.

DOMD was pre-approved for two licenses on August 16, 2016. This meant that it had won the application process and, if it successfully built out the business and passed additional regulatory checks in the coming months, would be awarded final licenses. DOMD's ownership changed again in the interim. It took on some new investors, which diluted DOMD OP's ownership interest. Black and Peebles gave most of their interest to defendant through a holding company, Trellis Holdings Maryland, that defendant had created. Plaintiff took the position that half of the interest transferred to Trellis was rightfully his. Defendant did not transfer plaintiff any interest in DOMD. After plaintiff sued for an interest in DOMD, defendant transferred nearly his entire ownership interest to a trust.

Plaintiff sued on November 23, 2018, asserting seven claims: (1) for a declaratory judgment that Trellis legally holds and is obligated to transfer 50% of its Class A member interest in DOMD to plaintiff; (2) civil theft; (3) conversion; (4) constructive trust; (5) breach of contract (specific performance); (6) breach of contract (damages); and (7) unjust enrichment. ECF No. 1. Plaintiff ultimately withdrew claims one and five, and the Court granted defendant's motion for judgment on the pleadings as to claim four. *See* ECF No. 149 at 3, 7. Claims two, three, six, and seven were tried to the Court.

## II.   BREACH OF CONTRACT

A party attempting to recover on a claim for breach of contract must prove: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages

to the plaintiff. *Harper v. Mancos Sch. Dist.*, 837 F. Supp. 2d 1211, 1217–18 (D. Colo. 2011) (citing *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.1992)). The parties dispute (1) the existence of a contract and (4) damages.

### A. Plaintiff and Defendant Had an Enforceable Contract

The parties disagree about whether the oral contract plaintiff seeks to enforce existed. A contract's existence is a question for the factfinder, particularly when "the evidence is conflicting or admits of more than one inference." *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986). A contract only exists when the parties have a meeting of the minds as to all essential terms of the contract. *See Jorgensen v. Colorado Rural Properties, LLC*, 226 P.3d 1255, 1260 (Colo. App. 2010). The parties need not discuss every material term for there to be a meeting of the minds if a party can show that both parties knew and agreed to the term. *Harper v. Mancos School Dist. RE-6*, 837 F. Supp. 2d 1211, 1218 (D. Colo. 2011).

To start, plaintiff did not allege, as defendant claims, the existence of a single contract governing all of plaintiff's transactions involving DOMD ownership interests. Such a contract would have required that plaintiff temporarily transfer his interest to Black and Peebles, entitled Black and Peebles to retain a portion of that equity, and required that they split the remaining shares between plaintiff and defendant. Defendant, assuming that this is the contract alleged by plaintiff, argues that the contract is unenforceable because it was made for an improper purpose. But plaintiff did not allege this contract. If he had, then Black and Peebles would have breached the contract by transferring their entire interest to defendant instead of splitting it between plaintiff and defendant. Plaintiff would have sued Black and Peebles in that case, not Mackie.

Nor did plaintiff allege breach of a nationwide partnership agreement whereby plaintiff and defendant agreed to split their equity interests in all marijuana businesses across the country. Plaintiff advanced this theory in closing arguments. He claimed that the contract's existence is

shown by 50/50 splits of similar companies in Oregon and Hawaii and obligated defendant to give him half of defendant's DOMD interest, no matter when or how acquired. The problem with this theory, as defendant pointed out, is that it simply was not pled in the complaint. The complaint alleges that "Mackie and Trellis [Maryland] agreed that Trellis would hold 50% of the [DOMD] Class A Membership interest held by Trellis for the benefit of Josh." ECF No. 1 ¶ 82. This alleges an agreement about ownership of only DOMD. It says nothing about a nationwide partnership agreement. In fact, nowhere in the complaint is there mention of Oregon, Hawaii, or any broad partnership agreement between plaintiff and defendant.[4]

Plaintiff actually alleged — and must prove the existence of — a contract whereby defendant would receive both plaintiff's and defendant's DOMD equity stakes from Black and Peebles and hold both interests until plaintiff wanted his back. This agreement was alleged by the complaint's representation "that Trellis would hold 50% of the [DOMD] Class A Membership interest . . . for the benefit of Josh," ECF No. 1 ¶ 82. It also comports with an earlier ruling in this case by Senior Judge Krieger, who described the ostensible agreement as one made "with Defendant Barch to 'share' equally the ownership of DO Maryland. ECF No. 104 at 11.

I find that plaintiff proved the existence of such a contract. Defendant's own statements confirm two key points that allow me to infer the contract's existence: (1) when Black and Peebles owned the relevant DOMD shares, defendant believed that he and plaintiff were entitled to equal portions of those shares; and (2) after the shares were turned over to defendant, he believed that at least some of the shares belonged to plaintiff.

---

[4] The closest that the complaint comes is a statement that plaintiff alone formed a Delaware LLC that he would use to establish medical marijuana businesses in other states. It does not mention a partnership. ECF No. 1 at ¶ 14.

First, defendant affirmatively facilitated Black and Peebles' turning over shares to both plaintiff and defendant. When Black and Peebles still possessed DOMP OP's entire interest in DOMD, defendant was, ironically, worried that Black and Peebles would refuse to turn over the shares they temporarily held. He helped create a document formalizing Black and Peebles' obligation to return the shares. The contract specified what would happen upon approval of a final license. The first draft said simply that Black would retain a 4.75% interest — it made no mention of Mackie or Josh. Mackie himself then edited the contract to clarify that defendant would receive no less than 26.875%, and plaintiff would receive no less than 26.875%. He and plaintiff both signed this document. To me, this is clear evidence that, before Black and Peebles transferred their interest to Trellis, defendant understood that half of the interest that would be transferred by Black and Peebles belonged to plaintiff.

Defendant then confirmed that plaintiff owned some shares of DOMD over which defendant exercised complete control. Black and Peebles eventually transferred all relevant shares to defendant rather than splitting them between plaintiff and defendant. Plaintiff claims that this was done pursuant to a contract whereby defendant would hold half of the shares for plaintiff. Defendant confirmed that he was holding some shares owned by plaintiff. When defendant set up Trellis Holdings Maryland — a name that plaintiff had invented and used for the Oregon company that the parties split 50/50 — he emailed plaintiff to keep him abreast of what was happening to plaintiff's equity interest. He wrote "just an FYI, moving *our* shares into this entity." (emphasis added). This confirms defendant's understanding that some of the shares held by Trellis were owned by plaintiff. Overall, the evidence convinces me that plaintiff and defendant had come to a meeting of the minds that required defendants Barch and Trellis hold half of the DOMD interest for plaintiff.

Defendant argues that if such an agreement existed, it is unenforceable because it was made for an improper purpose. In Colorado, courts generally will not enforce a contract whose purpose seeks to achieve an unlawful end. *See generally Guardian Title Agency, LLC v. Matrix Capital Bank*, 141 F.Supp.2d 1277, 1281 (D. Colo. 2001), *citing Sender v. Simon*, 84 F.3d 1299, 1307 (10th Cir. 1996). A contract may be unenforceable even if the performances called for under its terms are themselves permissible if the *purpose* the contract seeks to achieve is wrongful. *Sender*, 84 F.3d at 1307. Judge Krieger held in this case that unenforceability due to improper purpose "is generally treated as an affirmative defense, such that the party asserting unenforceability bears the burden of proof." ECF No. 104 at 11 (citing *Mulligan v. Smith*, 76 P. 1063, 1066 (Colo. 1904)).

Defendants did not meet their burden of showing that the contract was made for an improper purpose. Defendants argued primarily that the contract was made to hide Josh's ownership interest from the Colorado court overseeing his deferred judgment. That may have been true of Josh's decision to give Black and Peebles his interest in 2015, but it cannot have been plaintiff's purpose in making the contract at issue in this case. When plaintiff and defendants agreed to have defendants hold plaintiff's interest in DOMD, plaintiff's deferred judgment had already ended.

Defendants also seemed to argue that the contract improperly sought to hide Josh's ownership interest from the Maryland Cannabis Commission. Defendants did not convince me that this was the purpose. The Commission had already granted DOMD a preliminary license when plaintiff and defendant made their agreement. Defendants presented evidence showing that having Josh's name on the initial application during his deferred judgment would have hurt DOMD's chances of securing a license, but they did not show why plaintiff and defendant would

want to keep Josh's name off the documents after the preliminary license had been granted and after the deferred judgment had ended. In fact, the evidence seems to show that the importance of cultivating an appealing ownership structure evaporated after the preliminary license was issued. Mackie was kept off of the initial license application because the partners thought he would look bad to the Commission. But he owned a substantial stake in the time between the preliminary and final license. Defendants did not show that plaintiff and defendants conspired to hide Josh's name from the Maryland Commission.

Because I find that plaintiff proved an enforceable contract breached by defendants, I next turn to the issue of damages.

### B. Damages

Awarding damages requires answering two questions: First, how much of Culta (formerly DOMD) does the contract specify that plaintiffs owns? Second, what is the value of that ownership interest?

On the first question, I find that the contract entitled plaintiff to half of defendants' current interest in Culta. Plaintiff claims to own 26.875% of the company, which is half of the amount initially transferred from Black and Peebles to Mackie. This is too much to ask. Mackie diluted his shares as the company grew, and the evidence shows that those dilutions were essential to Culta's success. Josh wants to have his cake and eat it too. He wants half of Mackie's non-diluted interest, but he wants those shares at the sky-high valuation they reached because Mackie wisely agreed to dilute. I find that Josh is entitled to half of Mackie's interest, which I define as all shares Mackie holds, exercises control over, or has transferred for reasons other than as part of an ownership dilution deal to raise funds for the business.

The best estimate of defendants' ownership comes from Mackie's recent estate planning. The details are complex, but the bottom line is that Mackie transferred ownership of the DOMD

shares to a trust (though he retained control over those shares). In exchange, he received two promissory notes with a $12.8 million face value and present value of $5.7 million. The estate planning documents show that Mackie owned 30.784% of Culta. Using these numbers, I find that the contract entitles Josh to damages equal to 15.392% of Culta.

The parties dispute Culta's value. Plaintiff's damages expert, using the average of three company-valuation methods, estimated Culta to be worth $55 million. That valuation would mean that Mackie holds $17 million worth of Culta and entitle plaintiff to about $8.5 million. Defendant primarily poked holes in the expert's methods. Defendants did not seem to take issue with the expert's claim that the present value of Mackie's promissory notes — $5.7 million — set the "floor" for that Mackie's interest in Culta might be worth.

Both the high estimate ($8.5 million) and the low estimate (one-half of $5.7 million, or $2.85 million) have flaws. The high estimate relies on three different imperfect estimates of Culta's value. As defendants pointed out, there are reasons to think that each of these methods overestimate Culta's worth. The low estimate is also untrustworthy. In Mackie's estate planning, his goal was in-part to undervalue his Culta shares for tax-avoidance reasons.[5] Given the strength of Culta's business, valuing the shares Mackie holds at $5.7 million seems far too low.

I cannot calculate Culta's value with perfect precision — nobody can. But I think it fair, reasonable, and supported by the evidence to award damages that fall between the high and low estimates. A good number is provided by the face value of the promissory notes Mackie

---

[5] Plaintiff claims that Mackie's transfer was an attempt to insulate him from judgment. Testifying at trial, however, Mackie said the following: "let me be very clear on this. My estate planning, I plan to fully comply with whatever court order is awarded. I did this strictly for estate planning. It was no attempt to hide anything." I take him at his word and expect him to comply with the Court's order.

received in exchange for his shares of Culta.  Those notes totaled $12.8 million.  Half of that interest would therefore be $6.4 million.  I find $6.4 million in damages appropriate in the circumstances and award plaintiff that amount for defendants' breach of contract.

### III.   OTHER CLAIMS

Plaintiff also brings claims for conversion, unjust enrichment, and civil theft.  I decline to award them damages on these measures.

The economic loss rule precludes plaintiff's conversion claim.  This rule prevents duplicative recovery under contract and tort law.  *See Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000); *Great Am. Opportunities, Inc. v. Kent*, 352 F. Supp. 3d 1126, 1138 (D. Colo. 2018).   Because plaintiff has not shown that defendants had a tort duty independent of their contractual duties, I find that he cannot recover on his conversion claim.

Plaintiff's unjust enrichment claim fails for similar reasons.  Unjust enrichment is an equitable claim that relies on a quasi-contract, also called an implied-in-law contract, to restore a plaintiff something valuable unjustly retained by a defendant.  Unjust enrichment has a built-in equivalent to the economic loss rule: a plaintiff cannot recover unjust enrichment "when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract."  *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).  Because I find that the express oral contract covers the same subject matter as the quasi-contract under which plaintiff tries to recover, I hold that plaintiff cannot recover on an unjust enrichment claim.

Plaintiffs' civil theft claim must also be denied.  The elements of civil theft are that a person "knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception, and acts intentionally or knowingly in ways that

11

deprive the other person of the property permanently." *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 608 (Colo. 2016) (citing Colo. Rev. Stat. (C.R.S.) § 18-4-405).  The civil theft statute requires "the specific intent to permanently deprive the owner of the benefit of property." *Id.* at 608.  I find that plaintiff did not prove that he *owned* the shares held by defendants, only that he had a contractual right to be transferred the shares upon request.  Because defendants retained the shares (in violation of the contract) but did not somehow "obtain" or "retain" plaintiff's contractual right, I decline to award damages based on civil theft.

## IV.   ORDER

I find defendants liable for breach of contract and award plaintiff $6.4 million in damages.  As the prevailing party plaintiff is awarded reasonable costs to be taxed by the Clerk pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.  Judgment shall enter accordingly.

DATED this 7th day of September, 2022.

BY THE COURT:

_____

R. Brooke Jackson
Senior United States District Judge